[Cite as *University Hts. v. Weizman*, 2026-Ohio-733.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

CITY OF UNIVERSITY HEIGHTS,          :

    Plaintiff-Appellee,          :

                                No. 114877

    v.          :

ROBERT WEIZMAN, ET AL.,          :

    Defendants-Appellants.          :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 5, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-23-982540

---

### *Appearances:*

Nicola, Gudbranson & Cooper, LLC, Michael E. Cicero, and John B. Moenk, *for appellee.*

The Lindner Law Firm LLC and Daniel F. Lindner, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Robert Weizman ("Weizman") appeals the trial court's journal entry ordering abatement of the public nuisance at 4394 Groveland Road, University Heights (the "Property"), which is real property owned by Weizman, and appointing

a receiver for the Property. For the following reasons, we affirm the trial court's judgment.

## I. Facts and Procedural History

{¶ 2} Beginning in 2002, the City of University Heights (the "City") repeatedly notified Weizman of various building and housing code violations regarding the Property. On September 6, 2022, the City declared the Property a public nuisance after Weizman failed to remedy those code violations. On July 18, 2023, the City filed a complaint against Weizman requesting a preliminary injunction and a permanent injunction authorizing the City to abate the nuisance and enjoining Weizman from entering the Property. We note that Weizman acted pro se throughout all proceedings in the trial court.

{¶ 3} The court held a preliminary injunction hearing on September 3, 2024, and issued a journal entry the next day denying the City's motion. On January 21, 2025, the court held a permanent injunction hearing and, on February 4, 2025, the court issued a journal entry ordering abatement of the public nuisance, appointing a receiver for the Property to manage the nuisance abatement and enjoining Weizman "from occupying the Property and/or interfering with the . . . Receiver . . . relating to the abatement" of the Property.

{¶ 4} Weizman appeals and raises three assignments of error for our review.

I. To issue a permanent injunction pursuant to [R.C.] 3767.41, the record must contain clear and convincing evidence that the home presently constitutes a "public nuisance." The trial court committed reversible error by finding that the home cons[t]ituted a current public

nuisance and issuing a permanent injunction against appellant when the record demonstrated that there was zero (0) evidence before the trial court regarding the physic[a]l condition of the home. The most recent evidence regarding the status of the home dated more than two (2) and a half years prior to the date of the trial.

II. The trial court committed reversible error by finding that the home cons[t]ituted a current public nuisance and issuing a permanent injunction against appellant because the record demonstrates that there was zero (0) evidence that the home constituted a menace to the public health, welfare, or safety; is structurally unsafe, unsanitary, or not provided with adequate safe egress; constitutes a fire hazard, is otherwise dangerous to human life or is otherwise no longer fit and habitable; or that, in relation to its existing use, constitutes a hazard to the public health, welfare, or safety by reason of inadequate maintenance, dilapidation, obsolescence, or abandonment.

III. The trial court erred as a matter of law by appointing a receivership over the home when there is no statutorily-mandated financial plan in the record.

## II. Hearing and Trial Testimony and Evidence

### A. September 3, 2024 Hearing on Motion for Preliminary Injunction

#### 1. Geoffrey Englebrecht

{¶ 5} Geoffrey Englebrecht ("Englebrecht") testified that he is the Housing Community Development Director for the City. Englebrecht became involved with the Property after it was identified as a "problem property" by one of the City's inspectors, Tom Inghram, in April 2022. According to Englebrecht, the Property was a problem because "there was a lot of stuff or items in the driveway" that "had been out for a long time." Englebrecht testified that, as part of his job, he is familiar with "hoarding issues" and this was "likely" the situation with the Property.

**{¶ 6}** According to Englebrecht, the City sent code violation notices to Weizman at a Beachwood address that was on file for Weizman with the City. In May 2022, after seeing that nothing had been done, Englebrecht went to the Property, spoke with Weizman, provided to him a copy of the notices sent to the Beachwood address since Weizman claimed not to have received them and told him he needed to "clean up this driveway." According to Englebrecht, two weeks later, nothing had been removed from the Property's driveway.

**{¶ 7}** Englebrecht obtained a search warrant for the Property and went there with a representative from the department of health to inspect the interior. Englebrecht testified as follows about the condition of the Property:

> When we walked into the property there was no drywall. There were only studs. There were holes in the floor. [T]here were pretty much walkways that were created through all of the debris and all the junk, which then the walkways might have been three feet wide. Floor to ceiling of junk, debris, personal items, everything.

> When we did the walkthrough of the property we didn't find a toilet in the property. There was visible light coming through the roof of the property. There were buckets inside the property filled with only God knows what. It was a condition that you could tell was not suitable for human habitation. And we — I literally was worried for the man's health at that point.

**{¶ 8}** Englebrecht further testified that there was no "source of heat" in the Property other than "possibly a wood burning stove" in the basement. Englebrecht testified about photographs that were taken of the Property in August 2022. According to Englebrecht, since the photographs were taken, a lot of items have "disappeared" from the driveway of the Property, but for a vehicle and a grill, which were still there as of the day of the hearing. Inside the Property, there was exposed

wiring, water damage, holes in the floor, "there was pretty much walkways...which then the walkways might have been three feet wide . . ." and peeling paint. Referring to a picture of the front door at the Property, Englebrecht testified that "there is no actual way to get out of the property through the front."

{¶ 9} Englebrecht testified that he had visited the Property after the August 2022 pictures were taken, but he had not been inside. According to Englebrecht, since he started with the City, no permits have been "pulled" for any work at the Property. Englebrecht also testified that he had "recent corroboration" that the inside of the Property "remains the same" as it looked in the photographs.

{¶ 10} Englebrecht testified that, at the request of the City's mayor, he contacted a potential receiver, who issued a report about "what they saw at the" Property. Based upon the report, Englebrecht ascertained that "it's the same inside now as it was then." The potential receiver was unable to issue a quote for bringing the Property up to code compliance because "there's too much debris all over the house . . . ." The potential receiver issued a quote for $6,000 to clean out the inside of the Property.

{¶ 11} Englebrecht testified that the City's building commissioner ordered the house vacated and that the Property was "not fit for human habitation." According to Englebrecht, Weizman did not appeal this order.

{¶ 12} Englebrecht testified that, at a September 6, 2022 University Heights City Council meeting, he presented the August 2022 photographs and spoke about the Property's condition. Englebrecht also related to the council his "belief that the

owner of the property was putting himself at risk." At this meeting, the City Council deemed the Property a public nuisance.

{¶ 13} Asked if, other than clearing some items from the driveway, anything had been done at the Property since the pictures were taken, Englebrecht answered, "No permits, no nothing." According to Englebrecht, the City received complaints "from neighbors who are tired of the condition and just want something to happen."

{¶ 14} On cross-examination, Englebrecht testified that the Property is a public nuisance because it "is a danger from the inside . . . . There's no drywall. There's nothing stopping a fire. There's exposed wiring. There's wood in the basement next to a wood-burning stove, a basement that's filled with debris and trash and personal items. There's buckets inside the property. There is no toilet. There's issues at this property." Weizman asked Englebrecht if it was possible that there was a working toilet at the Property but Englebrecht and the inspector missed it. Englebrecht responded, "If there is a working toilet, it wasn't viewable by myself or by the health inspector [but] [t]hat's a possibility." Englebrecht also testified that it was possible that the exposed wiring was not "hot and active."

### 2. Robert Weizman

{¶ 15} Weizman testified that he has had problems with the City since he bought the Property. As an example, according to Weizman, the City required him to rewire, "do structural changes" and put a new roof on the garage before it "let" him tear the garage down. Additionally, Weizman testified that the City forced him

to "bribe them" to get permits and the City would not "let [him] under any circumstances whatsoever finish the house."

{¶ 16} According to Weizman, the only items that remain "outside the house [are] about ten bags of mulch for the flower beds, a vehicle, and a gas grill . . . ." Weizman testified that, in its current state, the Property "does not pose a blight to the neighborhood . . . ." Weizman further testified that he would be "left destitute" if the City takes the Property from him. Weizman testified that his plan was to clean out the Property, sell it as is, pay off the liens and keep the balance of the money. According to Weizman, he has been working in the construction industry since he was five years old, but he was badly injured years ago and has not been able to work.

{¶ 17} On-cross examination, Weizman testified that, as of the date of the hearing, there was no electricity, gas or water running to the Property. Weizman further testified that he was not living at the Property; rather, he was "living at a customer's house."

## B. January 21, 2025 Trial on Motion for Permanent Injunction
### 1. Michael D. Brennan

{¶ 18} Michael D. Brennan ("Brennan") testified that he has been the mayor of the City since January 2018, and he first learned about the Property in 2017, when he was campaigning. A City resident alerted Brennan about the condition of the Property and they walked together to observe the Property from the street. Brennan testified as follows about what he saw: "I observed that the house was not kept up, that it was in a shabby condition. It's been some time now, so I didn't take notes of

it, but my general impression was that it was not a well cared for property, it wasn't clear anybody was even living there, and if they were, they were not living in good conditions."

{¶ 19} According to Brennan, addressing "problem properties" was one of the points of his administration while he was mayor. "We have sought and obtained administrative search warrants in situations where there are conditions that warrant going in and making sure that for purposes of the health, safety and welfare of the community, that conditions are such that there should not be a condemnation or some other action that should be taken in order to make that house safe." Brennan testified that he "empowered the prosecutor . . . to be much more proactive about filing housing cases and proceeding with them."

{¶ 20} Brennan testified that the Cuyahoga County Department of Health issued a letter indicating that the Property was uninhabitable. Brennan conceded that the City filed more "housing cases" in municipal court than Beachwood, Shaker Heights, Pepper Pike and Hunting Valley combined. According to Brennan, the case concerning the Property was not an "extreme measure," but it was "a measure of last resort."

{¶ 21} Brennan testified as to several "housing noncompliance" cases filed against Weizman dating back to 2002. Brennan testified that the City has prosecuted Weizman ten times in the last 22 years for housing code violations regarding the Property but this method was not successful in reaching the goal of compliance. According to Brennan, since the September 2024 hearing on the

preliminary injunction, no permits have been pulled for the Property, and there have been no requests for a special pick up of debris or refuse.

{¶ 22} According to Brennan, the City was asking the court to appoint a receiver for the Property, who would "invest their own money in fixing up" the Property "and then be compensated for it and to turn some sort of appropriate profit in doing so . . . ." Brennan testified that this was necessary "for the benefit of the greater community and for the benefit of the other people who live on the street, not just because it looks better, but because it's safer, and because it's less likely to burn down, it's less likely to attract vermin, these are things that are in our city's interest. It's something that our administration has sought to do over the course of the last eight years."

## 2. Robert Weizman

{¶ 23} Weizman testified as if on cross-examination in the City's case-in-chief. Weizman confirmed that there is no gas, water or electrical service at the Property and that no one currently lives in the Property. According to Weizman, at the time of trial, he lived in Geauga County.

{¶ 24} Weizman denied being aware that the City declared the Property a public nuisance and he denied receiving any notices from the City regarding the Property in the last two years. Weizman confirmed that he has been working "in construction" since he was five years old. Weizman testified that he was aware that "certain permits" would need to be pulled for some of the work that needed to be done at the Property. As an example of something that required a permit, the City

raised running electrical service from the house to the garage. Weizman testified that he understood this and he did pull a permit for this at the Property.

{¶ 25} The prosecutor asked Weizman about a lengthy list of code violations concerning the Property dated September 9, 2022, which included restoring power to the garage, repairing or replacing windows, fixing the siding and installing electrical, plumbing and ceilings. According to Weizman, he did not correct these violations as of the date of trial.

{¶ 26} Additionally, the prosecutor asked Weizman, "[I]f I were to walk into the house today from the side door, would I still see pretty much the same thing that I see in this photo?" Weizman answered, "Yes. I haven't been allowed to work on the house." Specifically, Weizman admitted that there was still "exposed studs and ceiling joists on the first floor," there was still loose wiring and there were no utilities. The City asked, "Have you fixed any interior code violations since September of 2024?" Weizman replied, "I don't think so."

### 3. Markell Davis

{¶ 27} Markell Davis ("Davis") testified that she is the Director of Housing and Community Development for the City and has been in that position since September. Davis procured a written estimate of a potential receiver for a "cleanout" of the Property. According to Davis, the goal was to get "an estimate for the full job," but this was not possible "due to the amount of debris." Davis and the receiver went to the Property and observed a "numerous amount of debris that is piled up at the front of the" Property. They were not able to enter the house "because of the amount

of items . . . ." They took pictures of the inside through the windows. They were able to open the door to the attached garage, which was filled to capacity both horizontally and vertically. Davis testified that the cleanout estimate was $6,000.

{¶ 28} According to Davis, when she was at the Property, it looked no different from the pictures taken in August 2022 that served as exhibits at trial. Davis further testified that no permits have been pulled in the last two years concerning the Property. Davis testified that the City would like the court to appoint a receiver and for the receiver to complete the cleanout. Davis would then procure estimates to repair the Property to make it code-compliant and bring the estimates to the court for consideration.

### 4. Robert Weizman

{¶ 29} In Weizman's case-in-chief, he testified about various aspects of his life dating back to when he was a small child. Weizman accused the City and its employees of fraud, bribery and other nonviolent crimes. Weizman did not offer any testimony relevant to the allegations against him in this case. Weizman attempted to introduce exhibits, but because he had not filed a trial brief and had not turned the information over to the City during discovery, the court ruled that Weizman's proffered exhibits were inadmissible at trial.

### 5. Michael D. Brennan

{¶ 30} Weizman asked Brennan if the Property "has been cleaned up and the house looks great." Brennan answered, "No. The house does not look great and not everything has not been cleaned up."

**B. Exhibits**

{¶ 31} During the hearing and trial, the City introduced into evidence the following exhibits:

- June 5, 2023 Preliminary Judicial Report for the Property issued by Fidelity National Title Insurance Company showing judgment liens against Weizman and past due taxes in the amount of $40,590.62.[1]

- Notices of code violations for the Property from the City dated April 11, 2018; April 12, 2018; April 18, 2018; May 14, 2018; April 7, 2022; April 27, 2022 and July 13, 2022.

- August 18, 2022 letter from the Cuyahoga County Board of Health to the City regarding the "Assessment of Living Conditions" at the Property. This letter recommended that the Property "be elevated to the standards of the Codified Ordinances of the City" including the following:

  o There is a "high fire load within the structure" due to "scattered" and "cluttered" debris and items in the residence. "Any kind of rescue during a fire or medical emergency would be a challenge to first responders due to these conditions."

  o There is "no recognizable kitchen or bathroom" in the Property.

---

[1] According to the City, this amount has increased since the June 2023 report, although it is unclear from the record what the accumulated amount of liens and past due taxes is.

- "[M]any alterations done to the structure with no permits pulled . . . ."

- Unfinished nature of many rooms enables "fire to spread quickly through the structure."

- "Entry through the front door was not possible due to the large amount of clutter."

- Limited access to the exterior due "to the large amount of items in the driveway and the rear of the yard."

- "[C]ontainers actively breeding mosquitoes on the premise."

- "Insects were observed in many of the areas of the residence. Buckets were also found in the residence that appeared to have unidentifiable contents in them."

• September 6, 2022 City Council Meeting Agenda. Item N concerned a Motion Declaring the Property a public nuisance. After discussion about "hoarding conditions" and finding the Property "beyond deplorable," the City deemed the Property "not fit for human habitation" and a public nuisance.

• September 9, 2022 notice of code violations regarding the Property, which states that the violations must be corrected within 30 days to avoid abatement of the violations by the City. The notice listed dozens of code violations including: removing debris and clutter; restoring electrical power to the garage; repairing or replacing the siding;

installing plumbing throughout the Property, including fixtures; installing electrical outlets, conduits and fixtures throughout the Property; installing ceilings, floor coverings and doors throughout the Property; installing cabinets, countertops and exhaust fans in the kitchen and making all ingress and egress points in the house accessible. The notice also stated that a full inspection of the interior and exterior of the Property was impossible due to the clutter.

- August 2022 color photographs of the interior and exterior of the Property. The exterior photographs show mounds of clutter and debris around the perimeter of the sides and rear of the Property that are blocked by automobiles parked at the front of the Property so that the debris cannot be easily seen from the street. The interior photographs show no walls and no ceiling, exposed beams, rafters and electrical wires, sunlight visible through a hole in the roof and debris and clutter rendering most of the rooms unwalkable.

- November 19, 2024 quote from a demolition and construction company for $6,000 for a "[f]ull clean out, labor, dumpsters and material" at the Property. This quote notes that "a quote for health and safety repairs and [to] satisfy the violations list" will be provided after a clean out is completed.

- Summary sheets for ten building code violation and housing noncompliance cases filed against Weizman for the Property in Shaker Heights Municipal Court spanning from 2002 – 2022.

{¶ 32} At trial, Weizman attempted to introduce exhibits into evidence, including unauthenticated photographs, printouts of Google searches, two letters and an email exchange between himself and the court. As explained previously, the court ruled these documents inadmissible although it allowed Weizman to proffer them for the record. These documents are not at issue in this appeal.

### III. February 4, 2025 Journal Entry

{¶ 33} After trial, the court issued a journal entry captioned "Permanent Injunction Order." In this entry, the court found that Weizman had been notified by the City of the interior and exterior code violations regarding the Property, had "been afforded an opportunity to abate the nuisance and ha[d] failed to abate the said public nuisance." The court further found that, "in its current condition, the Property constitutes a public nuisance" and the City was authorized to abate the nuisance. The court ordered abatement of the nuisance by the City and appointed a receiver pursuant to R.C. 3767.41 to take control of the Property, pay expenses including taxes and liens, and perform the work, including a cleanout, to abate the nuisance. The court authorized Weizman to enter the Property to remove and dispose of personal belongings within 60 days of the journalization of the order. The court enjoined Weizman from accessing the Property outside this timeframe.

## IV. Law and Analysis

### A. Public Nuisance

#### 1. R.C. 3767.41 — Buildings Found to be Public Nuisance

{¶ 34} R.C. 3767.41(A)(1) defines "Building," in part, as "any building or structure that is used or intended to be used for residential purposes . . . . 'Building' does not include any building or structure that is occupied by its owner and that contains three or fewer residential units." It is undisputed that the Property is an unoccupied residential structure. Therefore, it is a building under the statute.

{¶ 35} R.C. 3767.41(A)(2) defines "Public nuisance" as follows:

[A] building that is a menace to the public health, welfare, or safety; that is structurally unsafe, unsanitary, or not provided with adequate safe egress; that constitutes a fire hazard, is otherwise dangerous to human life, or is otherwise no longer fit and habitable; or that, in relation to its existing use, constitutes a hazard to the public health, welfare, or safety by reason of inadequate maintenance, dilapidation, obsolescence, or abandonment.

#### 2. Civ.R. 65 — Injunctions

{¶ 36} Civ.R. 65 governs injunctions and section (B)(2) states that "any evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the merits becomes part of the record on the trial and need not be repeated upon the trial." Therefore, on appeal, we review all evidence presented at the preliminary injunction hearing as well as the permanent injunction trial.

### 3. Analysis of Public Nuisance

{¶ 37} In Weizman's first and second assignments of error, he argues that the court erred by finding that the Property is a public nuisance because the evidence in the record did not reflect the current condition of the Property and instead reflected the condition of the Property years ago and the Property did not meet the statutory definition of a public nuisance. We find no merit to either of Weizman's arguments.

{¶ 38} The City presented a plethora of evidence about the condition of the Property dating from at least 2017, when Brennan saw the Property, through November 2024 when the $6,000 quote to clean out the Property was generated. Importantly, several people testified that the condition of the Property had not changed from the time the evidence — including photographs, reports, and testimony concerning on-site inspections — was gathered to the time of trial. Most notably, Weizman himself testified several times that he had not done any work on the Property since the photographs were taken in August 2022. Weizman further testified that the condition of the Property was the same at the time of trial as it was in the photographs. Weizman additionally testified that, as of the trial date, he had not corrected the code violations for the Property included in the September 9, 2022 code violations list.

{¶ 39} Additionally, we note that evidence of the Property's condition prior to the time of trial was relevant to the City's case, because it showed that Weizman had notice as well as an opportunity to correct the violations that are the basis of the

public nuisance determination. Upon review, we find substantial and undisputed evidence of the Property's condition at the time of trial. Indeed, all evidence in the record shows that the condition of the Property was the same at the time of trial as it was when the photographs were taken when site visits occurred and when the Property was declared a public nuisance. Therefore, Weizman's first argument is without merit.

{¶ 40} Turning to Weizman's second argument, the following evidence was presented that correlates with the statutory definition of public nuisance found in R.C. 3767.41.

{¶ 41} Englebrecht testified that the Property was structurally unsafe, in that there were holes in the floor and roof and there were no walls. He testified that he was concerned for Weizman's health because the Property contained "floor to ceiling" junk and debris, as well as buckets with unidentifiable contents inside of them. According to Englebrecht, the Property was "not suitable for human habitation" and there was no safe egress through the front door. Englebrecht further testified that the Property was "a danger" because there was exposed wiring and "nothing stopping a fire."

{¶ 42} Weizman testified that there was no electricity, gas or running water at the Property. Weizman further testified that, as of the trial date, he had not corrected any of the code violations included on the September 9, 2022 list.

{¶ 43} Brennan testified that the Cuyahoga County Department of Health deemed the Property "uninhabitable," and this statement is supported by a letter

dated August 18, 2022, stating that the Property had a "high fire load" and the condition of the Property enabled "fire to spread quickly through the structure." Brennan further testified that having a receiver "fix" the Property was necessary "for the benefit of the greater community" particularly due to the Property being a fire hazard.

{¶ 44} Davis testified that she was not able to enter through the front door of the Property because of the amount of debris piled up inside the structure.

{¶ 45} The September 6, 2022 City Council Meeting Agenda included a statement finding the Property "beyond deplorable" and "not fit for human habitation." Photographs show that egress from the Property through the front door was impossible. They also show no walls, no ceilings, exposed beams, rafters and electrical wires, a hole in the roof and debris and clutter rendering the Property unwalkable.

{¶ 46} In *Hamilton v. Ebbing*, 2012-Ohio-2250 (12th Dist.), a situation similar to Weizman's case was presented to the trial court. In *Ebbing*, a "public health sanitarian for the City of Hamilton Health Department" testified that, dating from 2003 to 2008, the City of Hamilton sent Ebbing several orders to correct numerous code violations at properties he owned and, upon reinspection of the properties, found that Ebbing had not complied with the orders. *Id.* at ¶ 52. The violations included debris removal, exterior painting, exterior wood repair, window replacement, roof, gutter and downspout installation and water damage on the ceilings, floor and walls. *Id.* at ¶ 53. Evidence, including photographs, was

presented that the properties had no utilities, "a portion of the ceiling is missing, bare wires are hanging loose . . . the property was hazardous" due to the danger of fire and the "property was not fit for human habitation." *Id.* at ¶ 57. Evidence was also presented that Ebbing had notice of the violations and failed to correct them. *Id.* at ¶ 53. Additionally, Ebbing testified that "he has not completed any maintenance on the property since 2000 when a tenant moved out." *Id.* at ¶ 62.

{¶ 47} The *Ebbing* Court found the following:

> As the above evidence demonstrates, there is some competent credible evidence that the buildings are a menace to the public health, are structurally unsafe, no longer fit and habitable, and are otherwise hazardous to the public health and welfare by reason of Ebbing's inadequate maintenance. Therefore, we cannot find that the trial court erred in finding the buildings . . . were a public nuisance as defined in R.C. 3767.41(A)(2).

*Id.* at ¶ 64.

{¶ 48} Upon review of this case, we find substantial and undisputed evidence that the Property is a public nuisance as defined in R.C. 3767.41. Accordingly, the court did not err in making this determination, and Weizman's first and second assignments of error are overruled.

### B. Receivership

{¶ 49} Pursuant to R.C. 3767.41(C)(2), if the court determines that a building is a public nuisance, and "if the [court] additionally determines that the owner of the building previously has been afforded a reasonable opportunity to abate the public nuisance and has refused or failed to do so," the court "may appoint a receiver . . . to take possession and control of the building."

{¶ 50} Pursuant to R.C. 3767.41(C)(3)(a), the court in a public nuisance case "shall not appoint any person as a receiver unless the person first has provided the judge with a viable financial and construction plan for the rehabilitation of the building involved as described in division (D) of this section . . . ."

{¶ 51} R.C. 3767.41(D) states as follows:

Prior to ordering any work to be undertaken, or the furnishing of any materials, to abate a public nuisance under this section, the judge in a civil action described in division (B)(1) of this section shall review the submitted financial and construction plan for the rehabilitation of the building involved and, if it specifies all of the following, shall approve that plan:

(1) The estimated cost of the labor, materials, and any other development costs that are required to abate the public nuisance;

(2) The estimated income and expenses of the building and the property on which it is located after the furnishing of the materials and the completion of the repairs and improvements;

(3) The terms, conditions, and availability of any financing that is necessary to perform the work and to furnish the materials;

(4) If repair and rehabilitation of the building are found not to be feasible, the cost of demolition of the building or of the portions of the building that constitute the public nuisance.

{¶ 52} R.C. 3767.41(A)(3) defines "abate" or "abatement" as follows: "the removal or correction of any conditions that constitute a public nuisance and the making of any other improvements that are needed to effect a rehabilitation of the building that is consistent with maintaining safe and habitable conditions over its remaining useful life." Pursuant to R.C. 3767.41(C)(1), if the court finds a building

to be a public nuisance, it may issue "any . . . order that the [court] considers necessary or appropriate to cause the abatement of the public nuisance."

{¶ 53} Pursuant to R.C. 3767.41(F)(5), the court may empower a receiver to "remove and dispose of any personal property abandoned, stored, or otherwise located in or on the building and the property that creates a dangerous or unsafe condition or that constitutes a violation of any local building, housing, air pollution, sanitation, health, fire, zoning, or safety code, ordinance, or regulation."

{¶ 54} In Weizman's third assignment of error, he argues that the court erred by appointing a receiver without a "statutorily-mandated financial plan in the record" in accordance with R.C. 3767.41(D).  In Weizman's appellate brief, he does not take into consideration the receiver's $6,000 estimate to clean out the Property, which posits that a clean-out is necessary before the "financial and construction plan for the rehabilitation" can be submitted.  Weizman cites no case law to support his argument under this assignment of error, and our research reveals no Ohio case law on point.

{¶ 55} The City argues that, in this case, we need only look to section (C) of the statute, which governs appointment of a receiver, and we need not look at section (D) of the statute, which governs the work undertaken by the receiver.   This argument is not well-taken because section (C) states that the receiver shall "provide the judge with a viable financial and construction plan for the rehabilitation of the building as described in division (D) of this section."  Clearly, both section (C) and section (D) are to be taken into consideration in our review.

{¶ 56} Regardless of the parties' arguments, we are aware that the $6,000 clean-up estimate does not amount to an "estimated cost of the labor, materials, and any other development costs that are required to abate the public nuisance," as required under R.C. 3767.41(D). Our analysis, however, does not end there.

{¶ 57} Under R.C. 3767.41(C)(1), the court is authorized to issue "any . . . order that [it] considers necessary or appropriate to cause the abatement of the public nuisance." Furthermore, R.C. 3767.41(F)(5) specifically authorizes the court to empower a receiver to "remove and dispose of any personal property abandoned, stored, or otherwise located in or on the building and the property that creates a dangerous or unsafe condition or that constitutes a violation of any local building, housing, air pollution, sanitation, health, fire, zoning, or safety code, ordinance, or regulation . . . ."

{¶ 58} The question before us is whether the court has the authority to appoint a receiver to clean up the Property, which would in turn allow the receiver to submit the required "financial and construction plan for the rehabilitation." We hold that it does under both the spirit of the law and the circumstances of this case. The record establishes that Weizman does not appear to have any intention of cleaning, or making any repairs to, the Property. The record further establishes that a clean-up is necessary to get a viable financial and construction plan for abating the nuisance at the Property. Additionally, it is undisputed that the City presented a written quote for the cleanup, which amounts to a necessary and viable financial plan for this preliminary phase of the abatement. It would defy logic to hold that a

cleanup is necessary before establishing a plan, but a plan is necessary before a cleanup can occur.

{¶ 59} Upon review, we cannot say that the court erred by appointing a receiver under the unique circumstances of this case. Accordingly, Weizman's third assignment of error is overruled.

{¶ 60} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

LISA B. FORBES, P.J., and
EMANUELLA D. GROVES, J., CONCUR